1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ASBESTOS WORKERS PHILADELPHIA
WELFARE AND PENSION FUND, on behalf
of itself and all others similarly situated,

Plaintiff,

v.

AMAZON.COM, INC., ANDREW R. JASSY,
BRIAN T. OLSAVSKY, and DAVID
FILDES,

Defendants.

No. _____

**COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

<u>CLASS ACTION</u>

JURY DEMAND

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Plaintiff Asbestos Workers Philadelphia Welfare and Pension Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.   Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (i) regulatory filings made by Amazon.com, Inc. ("Amazon" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning Amazon; and (iv) other public information regarding the Company.

## I.   INTRODUCTION

1.   This securities class action is brought on behalf of all persons or entities that purchased or otherwise acquired shares of Amazon common stock between July 30, 2021, and April 28, 2022, inclusive (the "Class Period").   The claims asserted herein are alleged against Amazon and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.   Headquartered in Seattle, Washington, Amazon is a global technology company with multiple business lines, including its prominent online e-commerce business.   This matter arises from Defendants' material misrepresentations and omissions regarding Amazon's over-expansion of the infrastructure and fulfillment network for its e-commerce business.

3.   Beginning before the Class Period, and prior to the onset of the COVID pandemic in early 2020, a key priority for Amazon was increasing its ability to provide its e-commerce customers with shortened delivery times, including same-day delivery.   To meet that goal, Amazon invested significant capital to aggressively expand its infrastructure and fulfillment networks.

4.   When the COVID pandemic (and related lockdowns and other restrictions) hit in early 2020, consumer demand for goods purchased through Amazon's e-commerce business skyrocketed.   To meet that increased demand, Amazon continued expanding its infrastructure

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

and fulfillment network capacity.  Indeed, between the end of 2019 and the end of 2021, Amazon more than doubled its warehouse, distribution, and data center space, expanding from 192 million square feet to 387.1 million square feet over that time.

5.      Throughout the Class Period, Defendants repeatedly and consistently told investors that the Company's investments in expanding infrastructure and fulfillment network capacity were sound and appropriate decisions for the long term.  For example, after the market closed on July 29, 2021, Defendant Olsavsky, Amazon's Chief Financial Officer, represented to investors that "a significant amount of investment in our fulfillment network," "at a rapid rate," was needed in order to meet "strong multiyear demand."  Olsavsky assured investors that "we have a lot of growth to do here," which is why the Company was "moving as quickly as possible."  On October 28, 2021, Defendant Jassy, the Company's President and Chief Executive Officer, similarly told investors that "we've nearly doubled the size of our fulfillment network since the pandemic began."  That same day, Olsavsky represented that the Company's infrastructure and fulfillment investments were driven not just by recent increased demand related to the pandemic, but also "the long-term trends," as "the fundamentals of our retail business are strong," "[w]e feel good about where we are," and "[w]e're continuing to build capacity" to meet customer demand.

6.      These and similar statements made throughout the Class Period were false.  In reality, the Defendants knew or recklessly disregarded that the Company's infrastructure and fulfillment network investments substantially outpaced demand, and that those investments were a massive, self-imposed, undue drain on Amazon's financial condition.  Indeed, contrary to Defendants' public statements during the Class Period and as later confirmed by the *Wall Street Journal*, by July 2021, Defendants had already implemented cutbacks to Amazon's fulfillment capacity without disclosing that critical information to investors.

7.      The truth emerged on April 28, 2022, when Amazon reported a $3.8 billion net quarterly loss—its first reported net quarterly loss since 2015.  After months of falsely representing that Amazon's expansion of its e-commerce fulfillment network and infrastructure

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

2

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

was necessary and appropriate to meet both short-term and long-term customer demand, Defendants disclosed that day that Amazon was "no longer chasing physical or staffing capacity." Defendants disclosed $6 billion of "incremental costs," including $2 billion due to "overcapacity" in Amazon's "fulfillment and transportation network." Defendants further disclosed that they "expect[ed] the impacts of this . . . to persist for the next several quarters as we grow into this capacity." On this news, the price of Amazon stock fell $406.30 per share, or more than 14%, from a close of $2,891.93 per share on April 28, 2022, to close at $2,485.63 per share on April 29, 2022.

## II.   JURISDICTION AND VENUE

8.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1391(b). Amazon maintains its headquarters in Seattle, Washington, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

10.    Plaintiff is a multi-employer defined benefit union pension fund based in Philadelphia, Pennsylvania. As indicated in the certification submitted herewith, Plaintiff purchased shares of Amazon common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

3

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

11.     Defendant Amazon is a global technology company with multiple business lines, including e-commerce services and distribution, website development and hosting, inventory and supply chain management, and fulfillment and logistics.  Incorporated in Delaware, Amazon maintains its corporate headquarters in Seattle, Washington.  Amazon common stock trades on NASDAQ, under the ticker symbol "AMZN."  As of April 20, 2022, Amazon had over 508 million shares of common stock outstanding, owned by at least hundreds or thousands of investors.[1]

12.     Defendant Andrew R. Jassy ("Jassy") has served as President, Chief Executive Officer, and a director of Amazon since July 5, 2021.

13.     Defendant Brian T. Olsavsky ("Olsavsky") has served as Senior Vice President and Chief Financial Officer of Amazon since June 2015.

14.     Defendant David Fildes ("Fildes") has served as Head of Investor Relations of Amazon since June 2017.

15.     Defendants Jassy, Olsavsky, and Fildes are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with Amazon, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports, presentations, and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent the issuance of the materially false and misleading representations and omissions alleged herein, or cause them to be corrected.  Because of their positions and access to material non-public information available to

---

[1] On June 6, 2022, a previously announced split of Amazon common stock took effect.  Pursuant to the stock split, each outstanding share of Amazon common stock was divided into 20 shares.  Throughout this Complaint, references to the market price of Amazon common stock and to the number of shares outstanding reflect the (pre-split) numbers and values at the time.  Currently, Amazon has more than 10.1 billion shares of common stock outstanding.  The share prices referenced in Paragraphs 7 and 40 accurately state the stock's market prices at the time, however many sources for stock prices are "split adjusted" and accordingly show those prices as if the split had already happened—i.e., one-twentieth of the actual then-current price.

them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

**IV.     BACKGROUND**

16.     Headquartered in Seattle, Washington, Amazon is a global technology company with multiple business lines including, among others, e-commerce services and distribution, website development and hosting, inventory and supply chain management, and fulfillment and logistics.

17.     Prior to the onset of the COVID pandemic in early 2020, Amazon was focused on increasing its ability to deliver goods ordered through its e-commerce site on the same day the goods were ordered, or in other similarly short delivery windows.  To meet that goal, Amazon invested massive amounts of capital in order to aggressively expand the infrastructure and fulfillment networks that would ostensibly enable the Company to meet customer demand for shorter delivery times.

18.     When the COVID pandemic struck in early 2020, bringing with it lockdowns and other restrictions that limited shoppers' ability and willingness to shop in physical stores, consumer demand for goods purchased through Amazon's e-commerce business skyrocketed.  In order to meet that increased demand, Amazon continued to focus on increasing its infrastructure and fulfillment network capacity.  Indeed, between the end of 2019 and the end of 2021, Amazon more than doubled its warehouse, distribution, and data center space, expanding from 192 million square feet to 387.1 million square feet over that time.

19.     By no later than July 2021, when the Class Period begins, it was clear to Defendants that Amazon's warehouse and fulfillment center capacity exceeded demand.  In response, as would be reported almost a year later in the *Wall Street Journal*, Defendants made the first of what would become a series of intensifying cutbacks to Amazon's fulfillment capacity.  *See* Dana Mattioli, *Amazon CEO Andy Jassy's First Year on the Job: Undoing Bezos-Led Overexpansion*, WALL ST. J. (June 16, 2022) ("6/16/22 WSJ Article").  Despite their

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

5

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

knowledge that warehouse and fulfillment center capacity exceeded demand, necessitating significant cutbacks, Defendants concealed those cutbacks from the public investment community while at the same time assuring investors that the expansion plan remained on track and necessary.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

20.     The Class Period begins on July 30, 2021, the first trading day after Amazon held its second-quarter 2021 earnings conference call, which took place after the market closed on July 29, 2021.  Defendants Olsavsky and Fildes participated in the call on the Company's behalf.

21.     During the second-quarter 2021 earnings call, Defendant Olsavsky represented to investors that, although "people were at home less as [COVID-related] restrictions and lockdowns eased in some of our largest geographies" during second-quarter 2021, which contributed to declines in Amazon's year-over-year revenue growth, the Company's aggressive expansion strategy was sound.  Olsavsky stated on the call that "[a]s we think about the pull-forward in demand we've seen these past 18 months, it has required and will continue to require a significant amount of investment in our fulfillment network.  Our teams have done a remarkable job stepping up to serve customers and support our vendors and sellers, and we have worked hard to increase capacity at a rapid rate."

22.     On the second-quarter 2021 earnings conference call, in response to an analyst's question regarding fulfillment costs, Olsavsky further stated, "I would say on the fulfillment side, there are a number of things.  First, we're adding a lot of capacity. . . . [T]here has been very strong multiyear demand here that we are still catching up with from last year. . . . So we are continuing to add, and most of that development is really ahead of us in the second half of the year. . . . [W]e've literally nearly doubled our network here in the last 18 months from a size standpoint."

23.     In response to another analyst's question regarding "growth assumptions for e-commerce," Olsavsky stressed that "[w]e've been playing catch-up pretty much since the

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

6

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

pandemic started, but what suffered is space and space constraints.  And it's gotten better, but it was a factor last year. . . . [I]n the United States, while it's improving, it still hasn't reached the pre-pandemic levels.  So we have a lot of growth to do there."  Olsavsky later added that Amazon's "space planning" was "why we're building out our network so quickly in our minds. It's hard to do quickly, but we're moving as quickly as possible.  And again, we have a lot of new capacity being added in the second half of the year."

24.    As reported in the 6/16/22 WSJ Article, in September 2021, Defendants again made cutbacks to Amazon's fulfillment capacity, without disclosing those cutbacks to investors.

25.    On October 28, 2021, Amazon issued a press release, which it also filed with the SEC on Form 8-K, announcing its financial results for third-quarter 2021.  The release, which was signed by Defendant Olsavsky, quoted Defendant Jassy as stating that increased demand related to the COVID pandemic had "driven extraordinary investments across our businesses to satisfy customer needs—just one example is that we've nearly doubled the size of our fulfillment network since the pandemic began. . . . It'll be expensive for us in the short term, but it's the right prioritization for our customers and partners."

26.    Also on October 28, 2021, the Company held its third-quarter 2021 earnings conference call.  Defendants Olsavsky and Fildes participated in the call on the Company's behalf.  During the call, Olsavsky stated that "[w]e have nearly doubled our operations capacity in the past two years to keep up with customer demand," and assured investors that the costs of that increased capacity were still warranted.  Olsavsky stated:

> Last quarter we discussed the physical capacity we were adding to meet customer demand.  We made strong progress in Q3 to build and open new facilities and as a result for the first time since the pandemic began, we are no longer capacity constrained for physical space in the network.  September alone we brought online more than 100 new buildings in the United States including fulfillment centers, sort centers, and last mile delivery stations. For the year, we expect our 2021 footprint additions to exceed last year's build-out, which was also significant.
>
> Put this in perspective, we are on track to double our fulfillment network over the two-year period since the pandemic's early days.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

7

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

27.     On the third-quarter 2021 earnings call, Olsavsky assured investors that Amazon's expansion plans were proceeding apace and remained necessary to satisfy demand. An analyst asked whether, regarding "fulfillment capacity," Amazon could "be ahead of plan for next year and kind of cut down the investment there?"  Olsavsky responded, "while we've been chasing really demand for the last two years, we've been doing it—as I said, we're running at about 100% pretty much all of last year.  We are just now getting caught up on space for inventory. . . . But we expect the long-term trends to be strong in this business.  We're investing as such."

28.     During the same call, an analyst asked, "can you just talk to us big picture about any changes or factors that have changed the company's view about the long-term profitability, the long-term return on invested capital of the retail business now as opposed to at the end of 2019?" Defendant Fildes responded:

> So when you look at retail, it's certainly expensive right now, especially with the cost I've laid out in Q3 and Q4 for us to service that business. . . . We want to make sure that we're understanding where our costs and where our profits happen to be. . . . I get to see investments in warehouses, trucking programs, new offerings that we do, new country expansion.  We . . . make sure that not only are we delighting customers but we're delighting shareholders in the long-term.

> So we feel good about that.

29.     Also on the third-quarter 2021 earnings call, an analyst asked whether Amazon's efforts to increase same-day deliveries to customers "leverage[d] kind of your existing fulfillment center footprint."  Olsavsky responded that "we're well on our way to providing ultrafast delivery for things that require ultrafast or things like groceries and others, and we see that expanding. . . . you have to have a cost structure and a logistics network that will pay for the delivery over time.  So we see it as part of an offering that we offer to customers that ranges from two days to one day to two hours or one hour in some cases.  So we like to meet customers where they are, when they need things, and we're working on speed consistently."

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

8

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

30.     As reported in the 6/16/22 WSJ Article, in December 2021, Defendants again made cutbacks to Amazon's fulfillment capacity, without disclosing those cutbacks to investors.

31.     On February 3, 2022, Amazon issued a press release, which it also filed with the SEC on Form 8-K, announcing its financial results for fourth-quarter 2021.  The release, which was signed by Defendant Olsavsky, quoted Defendant Jassy as stating that "we continue to feel optimistic and excited about the business as we emerge from the pandemic.  When you combine how we're staffing and scaling our fulfillment network to bring even faster delivery to more customers, . . . there's a lot to look forward to in the months and years ahead."

32.     Also on February 3, 2022, the Company held its fourth-quarter 2021 earnings conference call.  Defendants Olsavsky and Fildes participated in the call on the Company's behalf.  During the call, Olsavsky stated:

> Despite lapping 2020's extraordinary sales growth, we continued to see an increase in customer demand and sales during the remainder of 2021, even as the economy opened back up. . . . We have invested significantly to keep pace with this demand, including nearly doubling our operations capacity in the past two years, expanding our fulfillment center footprint while adding significant transportation assets to ensure fast on-time delivery. . . . [T]he fundamentals of our retail business are strong, and we are optimistic about a number of growth businesses and a strong innovation pipeline.

33.     On the fourth-quarter 2021 earnings call, in response to an analyst's question about Amazon's investments to expand the Company's same-day delivery capacity, Olsavsky assured investors that "[w]e feel good about where we are.  We're continuing to build capacity that enables us to hit those [same-day delivery] cutoffs. . . . [A]s we've mentioned, we've doubled the capacity in the network over the last two years.  That is not all just to handle today's volume.  It's also to handle getting closer to the customer and being able to ship faster.  So, we like where we stand. . . . We like the progress we've been making lately, but we think the future is bright on that dimension."  Olsavsky further represented that "there's a lot of expansion that's been going on in the network, and we feel good about the basic contributors of profitability."

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

9

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

34.    On the fourth-quarter 2021 earnings call, another analyst asked, "Brian [Olsavsky], you doubled your fulfillment network and also your head count over the past two years. I believe you're about 2.5 years into this investment cycle. Where is Amazon in terms of emerging from this investment cycle? Can you see a slowdown in that big investment spending this year?" In response, Olsavsky discussed the Company's capital expenditures, noting that "just under 40% of that CapEx is going into infrastructure," and

> [a]bout just under 30% is fulfillment capacity, building warehouses, warehouse only, not transportation. And then just under 25% is transportation capacity and building out our AMZL network principally globally. . . . [T]hose are the three main areas.

> If I look to the future, we're still working through some of our plans for 2022, but it's coming into focus a bit. We see CapEx for infrastructure going up. We still have a very fast-growing business that's growing globally, and we're adding regions and capacity to handle usage that still exceeds revenue growth in that business. So we feel good about making those investments.

> On the fulfillment center side, that's about 30% of the spend in the last two years. We see that moderating, and that will probably now match growth of our underlying businesses.

35.    On April 14, 2022, the Company issued a Letter to Shareholders from Defendant Jassy, which accompanied Amazon's Annual Report for the year ended December 31, 2021, and was filed with the SEC on Form 8-K. In the Letter to Shareholders, Defendant Jassy discussed increased demand and related growth that Amazon attributed to the COVID pandemic. Jassy wrote:

> This growth also created short-term logistics and cost challenges. We spent Amazon's first 25 years building a very large fulfillment network, and then had to double it in the last 24 months to meet customer demand. . . .

> Ironically, just before COVID started, we'd made the decision to invest billions of incremental dollars over several years to deliver an increasing number of Prime shipments in one day. This initiative was slowed by the challenges of the pandemic, but we've since resumed our focus here. . . . [W]e believe our over 200 million Prime customers, who will tell you very clearly that faster is almost always better, will love this. . . . This type of iterative innovation is never finished and has periodic peaks in investment

---

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

10

years, but leads to better long-term customer experiences, customer
loyalty, and returns for our shareholders.

36.     The statements set forth above in Paragraphs 21-23, 25-29, and 31-35 were
materially false and misleading, and omitted information necessary to make the statements not
materially false and misleading.  Specifically, Defendants willfully or recklessly made and/or
caused the Company to make false and misleading statements that failed to disclose that, rather
than necessary to meet short-term and long-term customer demand, Amazon's rapid expansion
resulted in substantial overcapacity that drove massive losses and would substantially deplete the
Company's earnings moving forward.  Indeed, by July 2021 and continuing throughout the Class
Period, Amazon's capacity growth far outpaced demand and, in response, Defendants made a
series of intensifying cutbacks to warehouse and fulfillment capacity, without disclosure to
investors.  As a result of the foregoing, Defendants' positive statements about Amazon's
business, operations, and prospects were materially false and misleading, and lacked a
reasonable basis.

## VI.     THE TRUTH EMERGES

37.     On April 28, 2022, Amazon announced its financial results for first-quarter 2022.
The Company reported a $3.8 billion net loss, which was its first quarterly loss since 2015.  In
the Company's April 28, 2022 earnings release, filed with the SEC on Form 8-K, Defendant
Jassy admitted that Amazon was "no longer chasing physical or staffing capacity," which "may
take some time."  On the Company's first-quarter 2022 earnings conference call with analysts
that day, Defendant Olsavsky disclosed $6 billion of "incremental costs," including $4 billion of
costs that "we consider to be more within our control and are working to reduce.  These
additional costs correspond to the state of the labor force and fulfillment network."

38.     Regarding labor, Olsavsky stated that "we've quickly transitioned from being
understaffed to being overstaffed, resulting in lower productivity.  This lower productivity added
approximately $2 billion in cost compared to last year."  Regarding the fulfillment network,
Olsavsky admitted:

[W]e currently have excess capacity in our fulfillment and transportation network. . . . [W]e made conscious decisions in 2020 and early 2021 to not let space be a constraint on our business. During the pandemic, we were facing not only unprecedented demand but also extended lead times on new capacity, and we've built towards the high end of a very volatile demand outlook. . . . We estimate that this overcapacity, coupled with the extraordinary leverage we saw in Q1 of last year resulted in $2 billion of additional costs year over year in Q1. We do expect the impacts of this fixed cost leverage to persist for the next several quarters as we grow into this capacity.

When combining the impacts of the externally driven costs and the internally controllable costs, we get approximately $6 billion in incremental costs for the quarter. Approximately two-thirds of these costs are within our control. And with demand normalizing, we remain focused on rightsizing our cost structure and driving out any cost inefficiencies. Our guidance includes an expectation that we will incur approximately $4 billion of these incremental costs in Q2.

39.     Olsavsky further admitted on the first-quarter 2022 earnings call that "[i]n the consumer business . . . we currently have some excess capacity in the network that we need to grow into, so we have brought down our build expectations. . . . [W]e expect fulfillment dollars spent on capital projects to be lower in 2022 versus the prior year. We also expect transportation[] dollars spent on capital projects to be flat to slightly down."

40.     The Company's April 28, 2022, disclosures concerning the large present and future negative impact of Amazon's fulfillment network and infrastructure spending caused a precipitous decline in the market price of Amazon common stock. Specifically, in response to those disclosures, Amazon common stock declined from a closing price of $2,891.93 per share on April 28, 2022 to a closing price of $2,485.63 per share on April 29, 2022, a decline of $406.30 per share, or 14.05%.

41.     Post-Class Period reporting has confirmed that, when they made their misrepresentations concerning Amazon's expansion and fulfillment capacity, Defendants had already instituted significant cutbacks. As reported in the 6/16/22 WSJ Article, under Defendant

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

12

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

1    Jassy's leadership and direction, those cutbacks occurred in at least July, September, and

2    December 2021.

3            42.    Technology industry news site *The Information* similarly reported on May 24,

4    2022 that Amazon had "reversed course on an aggressive build-out," and beginning in March

5    2022, Amazon "canceled plans for nearly 10 million square feet of warehouse space, shelving

6    plans for more than a dozen fulfillment centers and delivery facilities around the U.S. as the

7    company wrestles with a costly space glut on the heels of the pandemic."  Paris Martineau,

8    *Amazon Quietly Axed Millions of Square Feet of Warehouse Space*, THE INFORMATION (May 24,

9    2022),  *available at*  https://www.theinformation.com/articles/amazon-quietly-axed-millions-of-

10   square-feet-of-warehouse-space.

11           43.    The canceled facilities included both "the cavernous (sometimes robotics-

12   enabled) warehouses known as fulfillment centers, where workers pack customer orders before

13   they are transported to shipping centers," and "smaller shipping hubs known as delivery stations,

14   which operate like local post offices dedicated exclusively to Amazon packages . . . that reflect

15   the internet retailer's growing fixation on shipping speeds."  *Id*.  Fulfillment center cutbacks

16   included canceling warehouses measuring roughly 1 million square feet each in states including

17   New Hampshire, Texas, and Wisconsin—which had not yet opened or been finally approved by

18   local authorities—and in California and Illinois, which were already built and have since been

19   listed by Amazon for sublease.  *Id*.  Canceled delivery stations included stations in California,

20   Connecticut, and North Carolina, which were not yet open, and two planned stations in the San

21   Francisco Bay Area, which Amazon closed and subleased in April 2022.  *Id*.  Amazon is also

22   reportedly looking to sublease a former Cadillac dealership in Manhattan, which it rented in

23   early 2021 and subsequently closed.  *Id*.

24           44.    As a result of Defendants' wrongful acts and omissions, and the precipitous

25   decline in the market value of the Company's common stock, Plaintiff and other Class members

26   have suffered significant losses and damages.

27

28

COMPLAINT FOR VIOLATIONS OF               13          BYRNES KELLER CROMWELL LLP
THE FEDERAL SECURITIES LAWS                          1000 Second Avenue, 38th Floor
                                                     Seattle, WA 98104
                                                     (206) 622-2000

## VII.    LOSS CAUSATION

45.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Amazon common stock and operated as a fraud or deceit on the Class (as defined below). Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Amazon common stock fell precipitously as the prior artificial inflation came out of the price. As a result of their purchases of Amazon common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.    CLASS ACTION ALLEGATIONS

46.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired the publicly traded common stock of Amazon during the Class Period (the "Class"). Excluded from the Class are Defendants, their agents, directors and officers of Amazon, and their families and affiliates.

47.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of April 20, 2022, there were over 508 million shares of Amazon common stock outstanding, owned by at least hundreds or thousands of investors.

48.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

14

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

(d)    Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)    Whether Defendants' conduct impacted the price of Amazon common stock;

(g)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)    The extent of damage sustained by Class members and the appropriate measure of damages.

49.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

50.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

51.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## IX.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

52.    Amazon's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

53.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Amazon who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS
15
BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.    PRESUMPTION OF RELIANCE

54.    At all relevant times, the market for Amazon common stock was an efficient market for the following reasons, among others:

(a)    Amazon common stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Amazon filed periodic public reports with the SEC and NASDAQ;

(c)    Amazon regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Amazon was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

55.    As a result of the foregoing, the market for Amazon common stock promptly digested current information regarding Amazon from all publicly available sources and reflected such information in the price of Amazon common stock.  Under these circumstances, all purchasers of Amazon common stock during the Class Period suffered similar injury through their purchase of Amazon common stock at artificially inflated prices and the presumption of reliance applies.

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

16

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

56.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Amazon's business operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of adequate safeguards to protect users from harm caused by Amazon's products, that requirement is satisfied here.

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

57.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

58.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Amazon common stock at artificially inflated prices.

59.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Amazon common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

60.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

61.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Amazon's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

63.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Amazon common stock.  Plaintiff and the Class would not have purchased Amazon common stock at the prices they paid, or at all, had they been aware that the market prices for Amazon common stock had been artificially inflated by Defendants' fraudulent course of conduct.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

65.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

66.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of Amazon within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Amazon, the Individual

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

18

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

Defendants had the power and ability to control the actions of Amazon and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

68.     WHEREFORE, Plaintiff prays for judgment as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

### JURY DEMAND

69.     Plaintiff demands a trial by jury.

DATED: July 6, 2022                    Respectfully submitted,

**BYRNES KELLER CROMWELL** LLP

By: /s/ Bradley S. Keller
     Bradley S. Keller, WSBA #10665
By: /s/ John A. Tondini
     John A. Tondini, WSBA #19092
     1000 Second Avenue, 38th Floor
     Seattle, Washington 98104
     Telephone: (206) 622-2000
     Facsimile: (206) 622-2522
     Email: bkeller@byrneskeller.com
            jtondini@byrneskeller.com

*Liaison Counsel for Plaintiff Asbestos Workers
Philadelphia Welfare and Pension Fund*

1

-and-

2

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

3

Avi Josefson (to be admitted *Pro Hac Vice*)

4

avi@blbglaw.com
Adam Hollander (to be admitted *Pro Hac Vice*)

5

adam.hollander@blbglaw.com
Scott R. Foglietta (to be admitted *Pro Hac Vice*)

6

scott.foglietta@blbglaw.com
1251 Avenue of the Americas

7

New York, NY 10020
Telephone: (212) 554-1400

8

Fax: (212) 554-1444

9

*Counsel for Plaintiff Asbestos Workers Welfare and*

10

*Philadelphia Pension Fund*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS                    20

BYRNES KELLER CROMWELL LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
(206) 622-2000

### CERTIFICATION PURSUANT TO
### THE FEDERAL SECURITIES LAWS

I, Michael E. Burns, on behalf of Asbestos Workers Philadelphia Welfare and Pension Fund ("Asbestos Workers"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Administrator of Asbestos Workers.  I have reviewed the complaint and authorize its filing.

2. Asbestos Workers did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Asbestos Workers is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Asbestos Workers' transactions in the Amazon.com Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Asbestos Workers has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification.

6. Asbestos Workers will not accept any payment for serving as a representative party on behalf of the Class beyond Asbestos Workers' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 5th day of July, 2022.

Michael E. Burns
Administrator
*Asbestos Workers Philadelphia Welfare and Pension Fund*

**Asbestos Workers**
**Transactions in Amazon.com Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 9/13/2021 | 19 | $ 3,447.0105 |
| Purchase | 10/15/2021 | 115 | $ 3,379.2629 |
| Purchase | 10/26/2021 | 72 | $ 3,377.6707 |
| Purchase | 12/17/2021 | 34 | $ 3,388.3484 |
| Purchase | 3/22/2022 | 93 | $ 3,301.4682 |
| Purchase | 3/24/2022 | 51 | $ 3,235.7390 |
| Purchase | 4/7/2022 | 89 | $ 3,165.5292 |
| | | | |
| Sale | 8/25/2021 | (98) | $ 3,299.3555 |
| Sale | 11/19/2021 | (45) | $ 3,690.6782 |
| Sale | 11/24/2021 | (57) | $ 3,570.1292 |
| Sale | 2/14/2022 | (24) | $ 3,103.3400 |
| Sale | 3/21/2022 | (37) | $ 3,229.8300 |